IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

NORTHGATE ASSOCIATES, LLLP )
and VIRGINIA RAND BOWMAN,   )
                            )
          Plaintiffs,       )
                            )      Civil Action No.: 1:08-cv-420
     vs.                    )
                            )
NY CREDIT FUNDING I, LLC,   )
                            )
          Defendant.        )
                            )

**MEMORANDUM OPINION AND ORDER**

THOMAS D. SCHROEDER, District Judge.

This matter is before the court on motion of Plaintiffs Northgate Associates, LLLP ("Northgate"), and Virginia Rand Bowman ("Bowman") to preliminarily enjoin Defendant NY Credit Funding I, LLC ("NY Credit"), from declaring and seeking remedies on defaults under a loan. (Doc. 21.) The parties have filed various affidavits and other evidence in support of their positions. (Docs. 24, 25, 26, 27, 28, 30.) The court has granted the motion of Transamerica Life Insurance Company ("Transamerica") and Aegon USA Realty Advisors, Inc. ("Aegon"), to intervene as parties plaintiff. (Doc. 33.) The motion was subject to an extensive hearing on July 24, 2008, and is ripe for disposition.

**I.   BACKGROUND**

This lawsuit stems from the lending arrangements on the Northgate Mall (the "Mall"), a shopping center in Durham, North

1

Carolina. Plaintiff Northgate, of which Bowman is a general partner, owns and operates the Mall. (Doc. 21, ¶ 1.) Northgate has two primary lenders: Transamerica, which holds the primary loan in the amount of approximately $58 million that is serviced by Aegon; and NY Credit, which holds the secondary, subordinated loan in the amount of $27.5 million. (Id., ¶¶ 7, 9-10.) This dispute stems from performance of the NY Credit loan, which implicates the rights of all parties under the collective loan documentation.

The NY Credit loan was closed on June 6, 2007. Plaintiffs and NY Credit executed a promissory note (the "Note") in the amount of $27.5 million (id., Ex. A) secured by a second deed of trust (the "Mortgage") encumbering the Mall. (Id., Ex. B.) The Note calls for Northgate to make monthly interest-only payments, with the principal due April 1, 2011. (Id., Ex. A.) The Note was to pay off an existing lender and provide construction funds to upfit unleased portions of the Mall, including a "Life Style" area with theater. Bowman also executed a Guaranty for the Note. (Doc. 26, Ex. 1.) Because Transamerica held the primary loan on the Mall, NY Credit also executed at closing an "Intercreditor" (or subordination) agreement, setting forth the rights and obligations between Transamerica and NY Credit.[1] (Doc. 21, Ex. C.)

At closing, NY Credit disbursed approximately $23 million to

---

[1]    Northgate in turn executed a "Borrower's Acknowledgment and Consent" in which it acknowledged that the Intercreditor conferred no rights upon it which it could seek to enforce. (Doc. 21, Ex. C at 32.)

pay off the prior lender and, pursuant to the loan, held back the nearly $4.5 million balance, of which $1.8 million was held in Capital Reserve and Interest Reserve accounts to fund capital improvements and interest, respectively, while the remaining $2.597 million was available to Northgate upon written demand no earlier than June 7, 2008. (Id., ¶¶ 11-14 & Ex. A at 1.) NY Credit appears to have disbursed funds from the reserve accounts to Northgate's satisfaction for the ensuing months.

In August 2007, Northgate located a third party to assume a separate $1.2 million loan on the Mall theater, thereby freeing up certificates of deposit collateralizing that loan which were owned by Bowman's mother. (Id., ¶¶ 19-20.) On August 20, 2007, Northgate borrowed $100,000 from Bowman's mother's CD proceeds, which Bowman contends John Walsh ("Walsh"), a NY Credit agent (now apparently no longer employed by NY Credit), orally approved. (Id., ¶ 21.)

On September 17, 2007, Northgate sought to obtain a $2 million unsecured line of credit with a third-party bank, which was permitted by the NY Credit loan. (Id., ¶ 23.) Because the third-party bank demanded that the line of credit be secured by property unencumbered by NY Credit's lien (a requirement not expressly contemplated by the NY Credit loan), NY Credit demanded the right to review and approve it. (Id., ¶ 23.) NY Credit ultimately approved a line of credit for $750,000, but Northgate alleges that

3

NY Credit's delay in doing so required it to obtain a $140,000 loan from Bowman's father to fund expenses. (<u>Id.</u>, ¶¶ 24-25.) Northgate claims that NY Credit was "put on notice" of this loan and "did not complain." (<u>Id.</u>, ¶ 24.)

By December 2007, Northgate "began to have difficulty working with NY Credit," including obtaining access to information about balances in the Interest Reserve account. (<u>Id.</u>, ¶¶ 26-27.) By February 2008, Northgate and NY Credit began discussions to restructure or refinance the loan, which continued through April 2008. (<u>Id.</u>, ¶¶ 28-31.) NY Credit claims that, through the process and after reviewing Bowman's January 2008 updated financial statements, it discovered several defaults under the Mortgage, which NY Credit detailed in an April 30, 2008, letter to Plaintiffs. (<u>Id.</u>, Ex. F.) Relevant for purposes of the present motion, NY Credit claimed the following:

- Failure of Bowman to maintain a net worth of $10 million, required by section 28(l) of the Mortgage. NY Credit premised this claim on its view that the Mall's value had allegedly declined by millions of dollars since June 2007 to the point that Bowman's net worth (based largely on her investment in the Mall) had fallen below the $10 million required by the loan.

- Failure to disclose partner loans, including the August 20, 2007, loan for $100,000, and the September 17,

4

2007, loan for $140,000. NY Credit also claimed that the January 2008 financials revealed for the first time the $500,000 December 2006 loan from Bowman's mother, which predated the NY Credit loan and was never disclosed as "Permitted Indebtedness" under section 29(a)(iv) of the Mortgage. NY Credit claimed these loans required written consent under section 28(i) of the Mortgage, which NY Credit did not, and would not, give.[2]

(Id., Ex. F.) NY Credit claimed that these defaults under the Mortgage permitted acceleration of the loan balance and invoked a loan provision that it contends permits it to refuse to advance additional funds. (Id., Ex. F at 2-3.) NY Credit specifically noted that it "preferred to avoid instituting foreclosure proceedings." (Id., Ex. F at 3.)

In a May 5, 2008, letter to Plaintiffs, NY Credit denied that its April 30 letter was a "default notice" under the loan but continued to maintain that the conditions cited therein constituted "defaults" that justified withholding further funds under the loan. (Id., Ex. H.) NY Credit continued to preserve all rights to all

---

[2] NY Credit also claimed that Northgate lacked a "clear marketing strategy" and thus failed to manage the property properly in violation of section 6(f) of the Mortgage (Doc. 26, ¶ 8), and that Northgate failed to disclose another $250,000 loan before closing. Under the guise of mismanagement, NY Credit also makes much of alleged incidents of criminal activity and a death that occurred in the Mall parking lot. NY Credit has abandoned the mismanagement argument for purposes of this motion only (Doc. 23 at 8), however, and at the hearing withdrew its argument as to the $250,000 loan.

remedies under the loan documents, without further explanation. (<u>Id.</u>, Ex. H at 2.)

On May 1, 2008, Northgate requested a draw of $140,917.84 from the Capital Reserve account for construction work. (<u>Id.</u>, ¶ 37.) NY Credit "ignored or refused that request," ostensibly on the grounds stated in the April 30 letter that cited alleged defaults. (<u>Id.</u>, ¶ 37.)

Northgate failed to make the $177,000[3] May interest payment due on May 6, 2008. (<u>Id.</u>, Ex. I; Doc. 26, ¶ 48.) On May 15, Northgate requested that NY Credit fund the interest payment partially from the $88,615.18 remaining in the Interest Reserve account, although there is no evidence Northgate tendered the balance due. (Doc. 21, ¶ 38 & Ex. G.) NY Credit refused to release the funds in a letter dated May 19, 2008, citing Northgate's failure to make the May interest payment, as well as the conditions cited in the April 30 letter (absent the mismanagement ground), as "Events of Default" under the loan. (<u>Id.</u>, Ex. I.)

By letter of June 10, 2008, NY Credit notified Plaintiffs (without consent of Transamerica or Aegon) that it was exercising its rights under Mortgage § 25(a)(viii)(B) and (C) to declare a "Cash Trap" period, requiring all rent deposits to be directed into an escrow account to be swept daily by NY Credit to pay expenses.

---

[3] NY Credit puts the figure at $171,517.61. (Doc. 26, ¶ 44.)

(<u>Id.</u>, Ex. K at 2.) During the Cash Trap, Northgate was denied access to proceeds and rents from the Mall. (<u>Id.</u>, ¶ 54.) NY Credit also demanded that Northgate engage a professional third-party property manager for the Mall during the Cash Trap period, pursuant to section 6 of the Mortgage. (<u>Id.</u>, Ex. K at 2.)

On June 13, 2008, Plaintiffs filed this action in the Superior Court for Durham County, North Carolina, and obtained an *ex parte* Temporary Restraining Order ("TRO") upon posting a bond of $1,000. (Doc. 1, Exs. 2, 5.) The TRO ordered NY Credit to rescind the Cash Trap and enjoined it from declaring and pursuing any defaults. (<u>Id.</u>, Ex. 5.) NY Credit removed this action to this court on June 24, 2008, based on diversity jurisdiction. The TRO was extended twice by consent — once to accommodate a hearing on the motion for Preliminary Injunction, and most lately until August 5, 2008. (<u>Id.</u>, Ex. 6; Doc. 31.) In the Amended Verified Complaint, Plaintiffs allege the following causes of action: (1) Declaratory Judgment as to the Note and Mortgage; (2) Declaratory Judgment as to the Intercreditor; (3) Breach of Contract as to the Note and Mortgage; (4) Breach of Covenant of Good Faith and Fair Dealing; (5) Unfair and Deceptive Trade Practices (though no statutory authority is cited); and (6) Interference with Contractual Relations. (Doc. 21.)

In the present motion, Plaintiffs seek to enjoin NY Credit from taking any action predicated upon any of the alleged defaults

(including contacting tenants, interfering with payments of rents or implementing the Cash Trap, imposing a third party manager, or instituting foreclosure proceedings), and from declaring further defaults.[4]  Plaintiffs argue generally that all alleged events of default were pretexts upon which NY Credit seeks to accelerate the loan.  Plaintiffs maintain that NY Credit's refusal to release funds from the Capital Reserve and Interest Reserve accounts for construction and interest, as the loan contemplated, was wrongful and forced Northgate to use its limited funds to pay contractors to avoid construction liens on the Mall (an event of default of the Transamerica loan) rather than to pay the May 6, 2008, interest payment.

Plaintiffs and NY Credit have presented conflicting evidence on the declared defaults:

- <u>Bowman's Net Worth</u>: Plaintiffs filed the affidavit of Raymond Cirz of Integra Realty Resources — New York and his appraisal effective July 2, 2008 that values the Mall "as is" at $95 million, with an estimated value of $105 million upon completion of upfit.  (Doc. 27.)  These valuations would provide adequate net worth to Bowman required by the loan.  Integra is the same appraiser NY

---

[4]  Plaintiffs also seek to enjoin NY Credit broadly "from taking any other action or exercising any other remedy related to Plaintiffs' past and current performance of their obligations under the Note, Mortgage, and/or Subordination Agreement [Intercreditor]" and to direct rescission of the Cash Trap.  (Doc. 21 at 28.)  The latter has already occurred, as noted <u>infra</u>.

Credit hired to appraise the Mall for the June 6, 2007, loan. (Doc. 28, ¶ 22.) NY Credit contends this appraisal is no longer valid and has offered a competing appraisal by Lee Holliday of CB Richard Ellis which values the Mall "as is" as of June 23, 2008, at $61.5 million — $33.5 million less than the Integra appraisal. (Doc. 24.) NY Credit contends that the CBRE appraisal would render Bowman's net worth negative and result in a loss of $11.5 million. (Doc. 26, ¶ 42.)[5]

- *August 20, 2007, $100,000 loan*: Bowman testified that NY Credit agent Walsh "specifically agreed" orally to this loan and never requested a writing.[6] (Doc. 28, ¶ 6.) NY Credit contends that it did not know of the loan, that the loan was not "Permitted Indebtedness," and that written consent, required by section 28(i) of the Mortgage, was never obtained. (Doc. 26, ¶¶ 31, 33.) No one has presented testimony from Walsh.

- *September 17, 2007, $140,000 loan*: Bowman testified that Walsh also "specifically agreed to the request" for this

---

[5] Notably, NY Credit's claim is an *historical* loss of $11.5 million. The CBRE appraisal does not appear to forecast whether NY Credit would suffer *further* loss if an injunction is entered, or how much.

[6] *See* Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., LP, 850 N.E.2d 653, 658 (N.Y. Ct App. 2006) (holding contractual requirement of written consent may be waived if knowingly, voluntarily and intentionally abandoned).

loan.  (Doc. 28, ¶ 7.)  Plaintiffs also contend that they
needed these funds because NY Credit was slow to approve
the $2 million line of credit that was to have provided
funding for ongoing upfit.  (<u>Id.</u>)  NY Credit again claims
that it was unaware of the loan, that the loan was not
"Permitted Indebtedness" under the Mortgage, and that no
written consent, as required by section 28(i) the
Mortgage, was obtained. (Doc. 26, ¶ 31.)  Again, no one
has presented testimony from Walsh.

- <u>December 2006 $500,000 loan</u>: Bowman testified that this
loan was not disclosed before closing on the Disclosure
Agreement's Schedule 9 listing Northgate's "Permitted
Indebtedness" (<u>Id.</u>, Ex. 8 (Sch. 9)) as required by
section 28(i) of the Mortgage because she disclosed it to
Walsh, who understood her plan to pay it with the
proceeds of the loan.  (Doc. 28, ¶ 5.)  She testified
that NY Credit withdrew that authority the night before
the June 6, 2007, loan closing.  (<u>Id.</u>)  Thus, Bowman
testified, NY Credit was aware of the loan, and any
failure to update the Schedule 9 of "Permitted
Indebtedness," a document drafted by NY Credit, was not
Plaintiffs' fault.[7]  (<u>Id.</u>)  NY Credit testified that it

---

[7]  Plaintiffs also argue that their allegedly unapproved partner
loans are not material because they do not raise Northgate's total
indebtedness beyond that contemplated by the NY Credit loan documentation

was unaware of the loan and would not have proceeded with the closing had it known. (Doc. 26, ¶ 32.) It also points to the fact that another loan from Bowman's mother was footnoted on the Schedule 9 of "Permitted Indebtedness" to be paid with proceeds of the loan, thus rebutting Plaintiffs' argument that the $500,000 loan was to be treated similarly.

- <u>May 6, 2008, Interest Payment</u>: Plaintiffs contend that it did not make this payment because NY Credit wrongfully withheld funds from the reserve accounts, causing Plaintiffs to exhaust then-available funds to pay construction companies. (Doc. 21, ¶ 46.) Bowman also testified that on March 26 and April 24, 2008, Mr. Edward J. Santoro of NY Credit specifically agreed to release funds from the reserve accounts for such construction. (<u>Id.</u>, ¶¶ 28, 32.) Plaintiffs further argue that this declaration of alleged default was premature because the Mortgage provides a fifteen-day "grace period" (until May 21) within which Northgate could pay without penalty. NY Credit points to the Note, which declares payment due on the 6th of every month (<u>id.</u>, Ex. A § 1), and the Mortgage, which defines an "Event of Default" as a failure to make a payment when due (<u>id.</u>, Ex. B

_____

at closing.

§ 19(a)(i)), and argues that there is no "grace period" but rather a monetary penalty for payments made after the expiration of fifteen days (id., Ex. A § 6). (Doc. 23 at 10 n.3.) Mr. Santoro has not denied that he made the two promises to release funds to pay incurred construction costs.

NY Credit argues that Plaintiffs' failure to disclose certain indebtedness undermines the deal it bargained for, that it validly declared events of default, and that its only security (its secondary collateralized position in the Mall) is threatened. NY Credit testified that it would not seek to implement the Cash Trap or appoint a professional third-party manager without the consent of Transamerica. (Doc. 29 at 1; Doc. 30, ¶ 4.) NY Credit's counsel repeated this representation to the court at the hearing on the motion. Transamerica's counsel represented at the hearing that his client has not consented to either remedy and is not inclined to do so presently. (Doc. 17 at 4.)

## II. ANALYSIS

### A. Applicable Standard

A preliminary injunction is an extraordinary remedy employed in the limited circumstances which clearly demand it. Direx Israel, Ltd. v. Breakthrough Med. Corp., 952 F.2d 802, 811 (4th Cir. 1991) (internal citations omitted). The requirements for obtaining a preliminary injunction in the Fourth Circuit are set

12

forth in <u>Blackwelder Furniture Co. of Statesville, Inc. v. Seliq Mfg. Co., Inc.</u>, 550 F.2d 189, 195 (4th Cir. 1977); <u>see</u> <u>also</u> <u>Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.</u>, 22 F.3d 546, 551 (4th Cir. 1994). Under the <u>Blackwelder</u> "balance of hardships" test, the four factors to be considered are: (1) the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied; (2) the likelihood of harm to the defendant if the requested relief is granted; (3) the likelihood that the plaintiff will succeed on the merits; and (4) the public interest. <u>Direx</u>, 952 F.2d at 812. The balance of hardships "are the two most important factors," and that analysis should precede the determination of likelihood of success. <u>Id.</u>, at 813. The hardships balance and the likelihood of success determination are "separate, sequential steps." <u>Id.</u> at 817.[8]

Under the first <u>Blackwelder</u> factor, a plaintiff must make a clear showing of actual and immediate irreparable harm. 550 F.2d at 195; <u>Direx</u>, 952 F.2d at 812 (quoting Dan River, Inc. v. Icahn, 701 F.2d 278, 284 (4th Cir. 1983)). Irreparable harm is that damage that is "incalculable[,] not incalculably great or small, just incalculable." <u>Blackwelder</u>, 550 F.2d at 197. Injuries such as loss of the right to continue a business, loss of permanent

---

[8] Both parties have argued whether entry of an injunction would preserve the status quo. While preserving the "status quo" is the rationale underlying a preliminary injunction, it is not an additional, separate test. <u>Rum Creek Coal Sales, Inc. v. Caperton</u>, 926 F.2d 353, 360 (4th Cir. 1991).

relationships with customers and investors, and the loss of goodwill built up by a successful enterprise have been found to constitute irreparable harm. <u>Fed. Leasing, Inc. v. Underwriters at Lloyd's</u>, 650 F.2d 495, 500 (4th Cir. 1981); <u>see Multi-Channel</u>, 22 F.3d at 552-53 (affirming district court finding of irreparable harm due to threat of permanent loss of customers and potential loss of goodwill); <u>Merrill Lynch, Pierce, Fenner & Smith v. Bradley</u>, 756 F.2d 1048, 1055 (4th Cir. 1985) (holding irreparable harm established because Merrill Lynch faced loss of its customers when broker who left firm attempted to take his former clients with him); <u>Fairfield Resorts, Inc. v. Fairfield Mountains Prop. Owners Ass'n</u>, No. 1:06cv191, 2006 WL 2524188, at *4 (W.D.N.C. Aug. 29, 2006) (finding irreparable harm to plaintiff in the form of loss of goodwill, reputation, and future business); <u>R.J. Reynolds Tobacco Co. v. Philip Morris Inc.</u>, 60 F. Supp. 2d 502, 509 (M.D.N.C. 1999) (finding irreparable harm in lost goodwill, lost advertising opportunities, threatened loss of market share and threatened loss of existing and potential customers). Injury that is capable of being compensated by an award of money damages at judgment, in contrast, is generally not irreparable. <u>Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.</u>, 17 F.3d 691, 693 (4th Cir. 1994) ("Mere injuries, however substantial, in terms of money . . . weigh heavily against a claim of irreparable harm.") (quoting Sampson v. Murray, 415 U.S. 61, 90 (1974)). The requirement of irreparable

14

harm must be made by a "clear showing." <u>Direx</u>, 952 F.2d at 812.

The threat of irreparable harm must also be "neither remote nor speculative." <u>Id.</u> (quoting Tucker Anthony Realty Corp. v. Schlesinger, 888 F.2d 969, 975 (2d Cir. 1989)). Thus, the irreparable harm to be suffered by a plaintiff must be "both 'actual' and 'immediate.'" <u>Id.</u> at 812 (quoting Dan River, Inc. v. Icahn, 701 F.2d 278, 284 (4th Cir. 1983)).

If the plaintiff has made a "clear showing" of irreparable injury absent injunctive relief, the court must next balance the likelihood of irreparable harm to the plaintiff if an injunction is not issued against the likelihood of irreparable harm to the defendant if an injunction is issued. <u>Id.</u> at 811; <u>In re Microsoft</u>, 333 F.3d at 526; <u>R.J. Reynolds</u>, 60 F. Supp. 2d at 509-510.

Only after the court determines the balance of the harms does it evaluate a plaintiff's likelihood of success on the merits. <u>Blackwelder</u>, 550 F.2d at 195; <u>Direx</u>, 952 F.2d at 812-813. If the balance "tips decidedly" in favor of the plaintiff, a preliminary injunction will be granted if "the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation." <u>Blackwelder</u>, 550 F.2d at 195; <u>accord</u> <u>In re Microsoft</u>, 333 F.3d at 527; <u>see</u>, <u>e.g.</u>, <u>O'Brien v. Appomattox County, VA</u>, No. 02-2019, 2003 WL 21711347, at *3 (4th Cir. July 24, 2003) (holding farmers who sought right to apply

15

Case 1:08-cv-00420-UA-RAE   Document 34   Filed 08/05/08   Page 15 of 23

biosolids to their farmland raised serious, substantial, and difficult issues due to Virginia Supreme Court decision and Virginia General Assembly's legislation limiting county restrictions on use of biosolids); Multi-Channel, 22 F.3d at 553 (holding plaintiff established strong likelihood of success on its conversion claim where it raised questions about whether the cable equipment it installed on the outside of apartment homes should be considered fixtures or personalty); Rum Creek, 926 F.2d at 363-55 (holding that Supreme Court cases on federal preemption raised "serious, substantial, and worthy issues for litigation" concerning the enforceability of a state labor statute).

"As the balance tips away from the plaintiff, a stronger showing on the merits is required." Rum Creek, 926 F.2d at 359. If the plaintiff fails to establish that the balance tips "decidedly" in its favor, the showing a plaintiff must make has been described variably as "a strong showing of likelihood of success," "a substantial likelihood of success," and one based on "clear and convincing evidence." Direx, 952 F.2d at 818 (quoting other cases); accord R.J. Reynolds, 60 F. Supp. 2d at 509. In these instances, a probability (not possibility) of success is required, which "implies that the plaintiff must have a very clear and strong case." Direx, 952 F.2d at 813. Rarely will a preliminary injunction be granted where the hardship balance does not tip "decidedly" in favor of plaintiff yet the likelihood of

success rose only to that sufficient to withstand a motion for judgment as a matter of law. <u>Id.</u> at 818 (stating that "to doubt is to deny").

Fourth and finally, the court must evaluate the public interest. <u>Blackwelder</u>, 550 F.2d at 197. Enforcing valid contracts serves the public interest. <u>Tolchex, Inc. v. Trainor</u>, No. 3:08-CV-236 2008 WL 2323232, at *6 (E.D. Va. June 2, 2008); <u>Moller-Maersk A/S v. Escrub Sys., Inc.</u>, No. 1:07cv1276, 2007 WL 4562827, at *1 (E.D. Va. Dec. 21, 2007).

**B. Application to Facts**

The first issue is the harm to Plaintiffs in the absence of injunctive relief. Plaintiffs claim the following as irreparable harm:

- Loss of control of the Mall (which at the hearing was argued to include possible foreclosure);
- Loss of access to rents, receivables, and other funds — including those in the Capital Reserve and Interest Reserve accounts;
- Threats of liens on the Mall because of an inability to pay for upfit, which "may" result in a default to Transamerica;
- Inability to pay other creditors, including Transamerica;
- Impairment of growth and "vitality" of the Mall through loss of tenants and employees; and

17

- Loss of goodwill as a result of the "negative press associated with a takeover, whether wrongful or not."[9]

(Doc. 22.) Each is addressed in turn.

Loss of control can possibly occur in one of two ways: appointment of a professional third-party manager, or foreclosure. As to the former, money damages cannot compensate for the loss of the opportunity to manage a business which has been under family control for decades. See, e.g., Davis v. Rondina, 741 F. Supp. 1115, 1125 (S.D.N.Y. 1990) (holding that loss of role in management of company plaintiff helped build and for which she guaranteed substantial loans constitutes irreparable harm); Int'l Equity Inv., Inc. v. Opportunity Equity Partners Ltd., 441 F. Supp. 2d 552, 563-64 (S.D.N.Y. 2006) (finding irreparable injury in frustration, dilution or loss of control of a business). Here, NY Credit cannot (and has stipulated that it will not) make such an appointment without the consent of intervenor Transamerica, the primary lender. (Doc. 21, Ex. C § 10.) Transamerica has not consented to such an appointment and represented at the hearing that it is unlikely to do so, at least on the present record.

The threat of foreclosure was the primary focus of the Plaintiffs at the hearing. Foreclosure, similarly, can cause

---

[9] This list is similar to but slightly modified from that alleged in the Verified Amended Complaint. (Doc. 21, ¶ 70.) The Verified Amended Complaint ties Plaintiffs' claim of irreparable harm to previous implementation (now rescinded) of the Cash Trap and threat of a professional third-party manager. (Id.) Further, the Verified Amended Complaint alleges only that such harms "may" result. (Id.)

18

irreparable harm.  Wonderland Shopping Ctr. Venture Ltd. P'ship v. CDC Mortgage Capital, Inc., 274 F.3d 1085, 1097 (6th Cir. 2001) (recognizing irreparable harm of foreclosure on shopping center following cash trap situation).  While foreclosure is an option under the loan documents (intervenors and NY Credit dispute whether the former's consent is required as a prerequisite), NY Credit has not filed such an action and has not threatened that one is imminent.  Rather, it has stated that, while foreclosure is a "real possibility," it hopes to avoid it — a view that was articulated as late as the hearing on this motion.  (Doc. 30, ¶ 7.)  Thus, loss of control, an irreparable injury, does not appear immediate on the present record.  This may change if a professional third-party manager is ordered with Transamerica's consent, or if foreclosure proceedings become imminent or are instituted.

Access to rents, receivables and other funds appears not to be an issue now that the Cash Trap has been suspended.  NY Credit cannot re-institute the Cash Trap without Transamerica's consent.[10] Again, Transamerica has not given such consent and has represented at the hearing that it is "less persuaded than ever" to do so on the present record.  Thus, this ground fails the immediacy requirement.  Hill v. Courter, 344 F. Supp. 2d 484, 490 (E.D. Va. 2004) (finding lack of immediacy where a state inspection, which

_____

[10] NY Credit's institution of the Cash Trap appears (at least on its face) to have been contrary to section 10 of the Intercreditor. (Doc. 21, Ex. C.)

was sought to be enjoined, was not currently contemplated by officials).

Lack of access to the funds in the Capital Reserve and Interest Reserve accounts, while immediate and ongoing, is money damages that have not been on this record shown to cause irreparable harm. With the Cash Trap rescinded, Northgate has access to all rents and receivables. Northgate indicated at the hearing that it was able to pay its current obligations, including the June 2008 interest payment (the parties having deferred payment of the July 2008 interest payment pending resolution of this motion). Plaintiffs have not demonstrated Northgate's current cash flow or that without the Capital Reserve and/or Interest Reserve accounts it will default on obligations that will result in irreparable harm. This may change, however, if NY Credit continues to press to withhold reserves and consequently puts into motion activities that cause an immediate threat of irreparable harm and loss of goodwill — conduct that on its face would not appear to be in the best interests of NY Credit to the extent it reduces the value of its collateral.

Threats of liens have not been shown to be actual or immediate on this record; indeed, the Verified Amended Complaint alleges they are "possible." (Doc. 21, ¶ 70.) While Plaintiffs have provided testimony as to construction debts it paid to avoid liens on the Mall, they have not provided evidence of any further outstanding

20

debts to contractors who would hold such liens, nor has there been any action (threatened or actual) to seek to enforce such liens. Further, Plaintiffs' allegation that a lien "may" result in a default under the Transamerica loan (<u>id.</u>) lacks a demonstration that Transamerica is acting (or even would act) on such a default. This ground is sufficiently remote at present to lack the requisite immediacy. Likewise, Plaintiffs have not provided evidence that, absent an injunction, it will be unable to pay Transamerica, its senior lender.

Plaintiffs' claim of loss of "growth and vitality of the Mall through loss of tenants and employees" remains speculative on this record. Indeed, Plaintiffs have not demonstrated that any tenant or employee is threatening to leave, or that any prospective tenant has declined to lease space because of the status of the Mall's upfit.[11] This, too, may change if NY Credit continues to withhold loan funds to the point that Northgate can demonstrate that it threatens an immediate loss of tenants, employees, and/or goodwill.

Lastly, Plaintiffs argue "irreparabl[e] harm" from the loss of goodwill that "negative press" would engender if there is a "takeover, whether wrongful or not."[12] For the reasons discussed

---

[11] Indeed, Transamerica and Aegon, through counsel, stated at the hearing that the key issue for Mall growth is whether there are tenant opportunities that are accretive to value that Northgate is not realizing. When the question was put to NY Credit, counsel stated, NY Credit could not identify any.

[12] The allegation of generalized loss of goodwill contained in the Verified Amended Complaint was similarly tied, at least in part, to the

above, while loss of control could result in irreparable harm, it is not immediate on the present record. Transamerica has not indicated it intends to consent to a professional third-party manager, and foreclosure proceedings (which also require conditions precedent) are neither pending nor immediate. So such "negative press" and resulting loss of goodwill are unlikely at this time.[13]

Preliminary injunctive relief is an "extraordinary remedy" that is "very far reaching" and should be granted only "sparingly." Direx, 952 F.2d at 816. The balance of hardships test does not negate the requirement of a showing of some irreparable harm. Rum Creek, 926 F.2d at 360. *At the present time* Plaintiffs have not made a clear showing that they will suffer immediate irreparable harm if injunctive relief is not granted. Rather, they have alleged actions, including the withholding of loan funds, which no doubt are making life difficult financially for Plaintiffs and may subsequently be shown to rise to the level of threatening irreparable harm.[14] But no showing has been made that Plaintiffs cannot survive financially until the merits of this litigation are reached, especially since the Cash Trap has been rescinded (a

_____

implementation of the Cash Trap and loss of control. (Doc. 21, ¶ 70.)

[13] NY Credit's claim that it "does not want to own the Mall, it only wants to ensure that [its loan] is repaid" (Doc. 26, ¶ 51) provides Plaintiffs scant comfort over fear of losing its more than 40 years of control over the property.

[14] The only cash flow information was submitted by NY Credit. (Doc. 26, Ex. 3). The information was dated and relied on annualized 2008 figures based only on the first quarter of 2008. (Id.)

prerequisite to imposition of a professional third-party manager under section 6 of the Mortgage) and any future initiation of a Cash Trap will, by stipulation of NY Credit, require intervenors' consent, which appears unlikely at present. Plaintiffs' alleged irreparable harm thus remains contingent on future events which may or may not develop. Depending on the conduct of the parties, such harm may come knocking on the door, perhaps even in the near future, at which time Plaintiffs may renew their motion, but it is not here quite yet. <u>Dan River</u>, 701 F.2d 728.[15]

Because Plaintiffs have not demonstrated the present threat of immediate irreparable harm, the court need not address the other <u>Blackwelder</u> factors at this time. <u>Direx</u>, 952 F.2d at 816.

## III. CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Preliminary Injunction (Doc. 21), is DENIED, WITHOUT PREJUDICE. The bond required on the prior Temporary Restraining Order is released.


                                    /s/ Thomas D. Schroeder
                                    United States District Judge


August 5, 2008

---

[15] While Plaintiffs must proceed without an injunction until the threat of irreparable harm becomes immediate, if it does, Defendant must proceed knowing that the threat of preliminary relief is not resolved.